**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE | : | Chapter 7 |
| | : | |
| STEPHEN G. SMITH, | : | |
| | : | **Bankruptcy No. 20-14400-AMC** |
| DEBTOR | : | |
| _____: | | |
| | : | |
| **KAPITUS SERVICING, INC. AS** | : | |
| **AUTHORIZED SUB-SERVICING** | : | |
| **AGENT FOR INVISION FUNDING,** | : | |
| **LLC, D/B/A HOME RUN CAPITAL,** | : | |
| **LLC** | : | |
| | : | |
| PLAINTIFF | : | |
| | : | **Adv. Proc. No. 21-00029-AMC** |
| v. | : | |
| | : | |
| STEPHEN G. SMITH, | : | |
| | : | |
| DEFENDANT | : | |
| _____: | | |

Ashely M. Chan, United States Bankruptcy Judge

**OPINION**

## I.    INTRODUCTION

In March 2019, Invision Funding, LLC d/b/a Home Run Capital, LLC ("Home Run Capital")
provided approximately $62,600.00 in small business funding to High Performance Gymnastics
Training Center, LLC ("High Performance").  In exchange for a cash advance, High
Performance sold its future account receivables in the amount of $83,884.00 to Home Run
Capital and granted Home Run Capital the right to debit $273.00 from its bank account each
business day.  Shortly after receiving the funding, Stephen G. Smith ("Debtor" or "Defendant"),
the owner of High Performance, transferred substantial funds from High Performance's bank
account to his personal bank account.  A few weeks later – after only $4,641.00 in receivables

1

had been paid to Home Run Capital – the Debtor directed the bank to stop all payments to Home Run Capital. Although the Debtor continued to operate his business until September 2020, High Performance made no further payments to Home Run Capital.

In this adversary proceeding, Kapitus Servicing, Inc. as Authorized Sub-Servicing Agent for Home Run Capital ("Kapitus" or "Plaintiff") seeks to have the prepetition debt owed by the Debtor pursuant to his personal guaranty of High Performance's obligation to Home Run Capital declared nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(2)(B), § 523(a)(4), and/or § 523(a)(6). For the reasons described below, the Court concludes that Kapitus has established by a preponderance of the evidence that the debt is nondischargeable pursuant to § 523(a)(6) as a debt incurred for a willful and malicious injury.

## II.    FACTUAL FINDINGS

Prior to commencing this bankruptcy proceeding, the Debtor owned and operated High Performance, a gymnastics school located in Chalfont, Pennsylvania. Case No. 21-00029, ECF Doc. No. ("ECF") 19 ("Joint Pretrial Statement"), 2. In March 2019, a representative of Home Run Capital contacted the Debtor regarding potential funding for High Performance. Trial Tr. 8:12-21, Apr. 29, 2024, ECF 75 ("April 29th Tr."). The Debtor provided certain information to a representative of Home Run Capital over the phone, and on March 14, 2019, Home Run Capital submitted a finance application ("Finance Application") to Kapitus for underwriting review. *See* Ex. P-1; Trial. Tr. 29:9-14, Oct. 26, 2023, ECF 73 ("Oct. 26th Tr."). The Debtor also provided various documents requested by Kapitus, including a voided check, a copy of his driver's license, a tax return, and High Performance's bank statements (collectively, the "Underwriting Documents")[1]. *See* Ex. P-4; Oct. 26th Tr. 42:15-24.

---

[1] Based on the evidence presented at trial, the Court finds that the Underwriting Documents were the only documents provided by the Debtor prior to funding. The Debtor testified that he also provided profit and

On March 15, 2019, the Debtor, as principal of High Performance, executed a Future Receivables Factoring Agreement ("Factoring Agreement") between High Performance, as "Merchant," and Home Run Capital, as "Purchaser." *See* Ex. P-3.  In the Factoring Agreement, Kapitus is identified as the "Authorized Sub-Servicing Agent" of Home Run Capital "providing administrative, bookkeeping, reporting and support services for [Home Run Capital] and [High Performance]."[2] Ex. P-3 at 2.

Pursuant to the Factoring Agreement, Home Run Capital agreed to provide High Performance with a cash advance in the amount of $62,600.00, referred to as the "Purchase Price." *Id.* at 1.  In exchange, High Performance agreed to sell its future account receivables ("Receivables") to Home Run Capital until such time that High Performance paid $83,884.00, referred to as the "Receipts Purchased Amount." *Id.*  The Factoring Agreement provides, in relevant part:

> [High Performance] hereby sells, assigns and transfers to [Home Run Capital] in consideration of the funds provided ('Purchase Price') as specified below, all of [High Performance]'s future receipts, accounts, contract rights and other obligations arising from or relating to the payment of monies from [High Performance]'s customers and/or other third party payors (collectively the 'Receipts' defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business), until such time as the 'Receipts Purchased Amount' or 'Purchased Amount' has been delivered by [High Performance] to [Home Run Capital]. *Id.*

High Performance further agreed to remit 13%, the "Specified Percentage," of the Receivables until the Receipts Purchased Amount is paid. *See id.*  The Factoring Agreement provides, in relevant part:

---

loss statements. Oct. 26th Tr.79:6-17.  However, the profit and loss statements admitted into evidence are all dated well after the Debtor applied for this funding. *See* Ex. P-10; Oct. 26th Tr. 49:14-17.

[2] Kapitus is also designated as Home Run Capital's general agent to service and enforce the Factoring Agreement, including enforcement through legal action. Ex. P-3 at 2; Joint Pretrial Statement at 3.

[t]he Receipts Purchased Amount shall be paid to [Home Run Capital] by [High Performance] irrevocably authorizing <u>only one</u> depositing account acceptable to [Home Run Capital] (the '<u>Account</u>') to remit the percentage specified below (the '<u>Specified Percentage</u>') of [High Performance]'s Receipts, until such time as [Home Run Capital] receives payment in full of the Receipts Purchased Amount. *Id.*

Pursuant to the Factoring Agreement, High Performance also authorized Home Run Capital to debit $273.00, identified as the "Specific Daily Amount," from High Performance's bank account to be credited against the Specified Percentage. *Id.* ("In consideration of servicing the account, [High Performance] hereby authorizes [Home Run Capital] to ACH Debit the 'Specified Amount' from the merchant's bank account as the base payment credited against the Specified Percentage due.").

In the Factoring Agreement, High Performance also made various representations and warranties. *Id.* at 3–4.  Such representations include *inter alia* that High Performance is solvent and current on all lease, rent or mortgage payments, *Id.* at § 2.1; High Performance does not anticipate filing for bankruptcy protection or the filing of an involuntary petition against High Performance, *Id.* at § 2.9; and High Performance is entering into the Factoring Agreement for business purposes and not for personal, family or household purchases, *Id.* at § 2.12.  Kapitus relies heavily on the representations made in factoring agreements in its underwriting decisions and only countersigns such agreements after Kapitus has completed the underwriting review. Oct. 26th Tr. 63:1-20.

The Factoring Agreement authorizes Home Run Capital to impose certain fees and costs in the event of a default by High Performance.  For example, the Factoring Agreement provides for a $2,500.00 "Default Fee" as well as certain fees for each rejected ACH transfer. *See* Ex. P-3, App. A.  Section 3.3 of the Factoring Agreement provides for the recovery of reasonable costs associated with a breach:

[High Performance] shall pay to [Home Run Capital] all reasonable costs associated with (a) a breach by [High Performance] of the Covenants in this [Factoring] Agreement and the enforcement thereof, and (b) the enforcement of [Home Run Capital]'s remedies set forth herein, including but not limited to expenses, court costs and attorneys' fees of twenty-five percent (25%) of any balance due.

Contemporaneous with the Factoring Agreement, the Debtor and High Performance also executed a Security Agreement and Guaranty ("Guaranty Agreement"). Ex. P-3, 7–11. The Debtor executed the Guaranty Agreement both individually, as "Guarantor," and as principal of High Performance. *See id.* at 9.  Pursuant to the Guaranty Agreement, the Debtor agreed to personally guarantee High Performance's obligations under the Factoring Agreement. *Id.* at 8. The Guaranty Agreement provides, in relevant part:

> **Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to [Home Run Capital] [High Performance]'s performance of all of the representations, warranties, covenants made by [High Performance] in this Agreement and the [Factoring] Agreement, as each agreement may be renewed, amended, extended or otherwise modified (the 'Guaranteed Obligations'). *Id.*

On March 18, 2019, the Debtor participated in a recorded pre-funding call ("Funding Call") with a representative of Kapitus. Ex. P-2; *see also* Oct. 26th Tr. 40:21-22.  As part of its underwriting process, Kapitus conducts pre-funding calls to confirm certain information about the funding agreement and the contract counterparty. Oct. 26th Tr. 30:9-16.  During the Funding Call, a representative from Kapitus asked the Debtor various questions about High Performance's business. Oct. 26th Tr. 35:11-25, 36:1-18.  The Debtor represented that (i) he did not anticipate closing his business for any reason over the next twelve months, (ii) he did not anticipate selling his business in the next twelve months, (iii) he did not anticipate his business filing for bankruptcy protection in the future, (iv) he was not in arrears on any loans or with any financial institutions, and (v) he did not currently have a balance with any other financing source that takes payments on less than a monthly basis. Oct. 26th Tr. 35:11-25, 36:1-18.  Kapitus relies

5

upon the representations made during pre-funding calls in its underwriting decisions. Oct. 26th Tr. 41:13-14.

On March 18, 2019, Kapitus transferred $61,015.00[3] to High Performance's business checking account at Citizens Bank ("Business Account") via ACH. *See* Ex. P-5 ("Merchant Statement").[4]  Starting on March 22, 2019, Kapitus began debiting $273.00 from the Business Account each business day. *Id.*

According to bank records, a total of $22,500.00 was transferred from the Business Account to the Debtor's personal bank account after High Performance received the funding: $1,500.00 transferred on March 19, 2019; $6,000.00 transferred on March 26, 2019; $2,000.00 transferred on April 1, 2019; $3,000.00 transferred on April 2, 2019; and $10,000 transferred on April 3, 2019. *See* Ex. P-9; Ex. P-11; Oct. 26th Tr. 102:13-25, 103:1-3, 103:20-23, 106:15-23.

Kapitus was able to successfully debit $273.00 from the Business Account for the last time on April 12, 2019. *See* Ex. P-5.  On or around April 16, 2019, the Debtor directed Citizens Bank to place a stop payment on Kapitus' debits from the Business Account. Oct. 26th Tr. 110:2-4.  After the stop payment was placed on the account, Kapitus tried to debit the daily amount from the Business Account at least three more times, but the attempted debits were unsuccessful. *See* Ex. P-5; Oct. 26th Tr. 68:5-9.  In total, Kapitus received $4,641.00 in Receivables from High Performance, leaving an outstanding balance of $79,243.00 unpaid. *See* Ex. P-5.

On April 16, 2019, a representative from Kapitus notified the Debtor that High Performance's account was in default. *See* Ex. P-7 ("Collection Notes"), 16.  At some point

---

[3] According to Kapitus' internal records, the amount transferred to High Performance was $61,015.00, which appears to be the $62,600.00 Purchase Price less a $1,565.00 "Origination Fee" and a $20.00 "Funding ACH Fee." *See* Ex. P-5.

[4] At trial, the Court did not affirmatively state on the record that exhibits P-5, P-6, P-7, P-9, P-10, and P-11 were admitted into evidence.  No objections were made to the admission of these exhibits at trial, and such exhibits are admitted into evidence. *See* Oct. 26th Tr. 74:1-7, 134:9-12.

thereafter, the Debtor engaged Corporate Turnaround, a debt consolidation company, to resolve High Performance's outstanding debts. Oct. 26th Tr. 110:22-25, 111:7-9. Jared Fernandes ("Mr. Fernandes"), a representative from Corporate Turnaround, contacted Kapitus regarding settlement of High Performance's outstanding debt. *See* Ex. P-7. Mr. Fernandes and a representative from Kapitus discussed the possibility of the Debtor resolving the debt through a payment plan over a period of twelve months, but they were unable to reach an agreement. *See id.* at 1–2.

Mr. Fernandes sent Kapitus a letter written by the Debtor ("Hardship Letter"), dated May 1, 2019, indicating that High Performance would be unable to pay its debt to Kapitus. *See* Ex. P-6; *see also* Ex. P-7, 2–3. In the Hardship Letter, the Debtor represented that High Performance's financial challenges started in June 2018, when a competing gymnastics gym opened nearby. Ex. P-6. In March 2019, the Debtor's brother, who at that time was a gymnastics coach at High Performance, was arrested for driving under the influence, which ultimately led many members of the girls' team to leave High Performance by April 2019. *Id.* The Debtor claimed in the Hardship Letter that April 2019 was High Performance's "breaking point." *Id.*

On June 10, 2019, Kapitus filed a complaint against the Debtor and High Performance in the Circuit Court of the County of Henrico, Virginia ("Virginia State Court"), and on October 25, 2019, the Virginia State Court entered judgment against the Debtor and High Performance in the amount of $81,893.00, plus interest at the judgment rate of 6% per annum from the date of judgment, attorneys' fees of $20,473.23, and any and all court costs ("Judgment"). Compl. ¶ 49; Answer ¶ 49; *see also* Ex. P-7, 3.

High Performance continued to operate until September 2020, and it appears that additional Receivables were received by High Performance after the Debtor directed Citizens

Bank to stop payment to Kapitus.[5]  In January and February of 2020, High Performance was turning a profit. Oct. 26th Tr. 91:4-13.  Due to the COVID-19 pandemic, High Performance was forced to temporarily cease operations in March 2020. Oct. 26th Tr. 90:1-24.  High Performance reopened four months later but permanently ceased operations in September 2020. Oct. 26th Tr. 118:18-22.

## III.   PROCEDURAL HISTORY

On November 10, 2020, the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. Case No. 20-14400, ECF 1.  On February 8, 2021, Kapitus filed a motion pursuant to Federal Rule of Bankruptcy Procedure 4007(c) requesting an extension of the deadline to file a complaint to determine dischargeability of a debt. Case No. 20-14400, ECF 10. On March 10, 2021, the Court entered an order extending the deadline for Kapitus to file a complaint objecting to the dischargeability of debts through and including April 9, 2021. Case No. 20-14400, ECF 14.

On April 9, 2021, Kapitus filed the instant adversary complaint ("Complaint") seeking to have the prepetition debt owed by the Debtor pursuant to the Guaranty Agreement deemed nondischargeable. Case No. 21-00029, ECF 1 ("Compl.").  On October 26, 2023, trial was held over Zoom ("Trial"). Case No. 21-00029, ECF 73.  As of October 26, 2023, the total amount due pursuant to the Factoring Agreement, including the Judgment, interest, and attorneys' fees was $174,950.81 ("Debt"). Oct. 26th Tr. 73:22-24.

---

[5] The ending balance in the Business Account was as follows: $9,867.07 in June 2019, $8,642.83 in July 2019, $6,574.27 in August 2019, $4,583.88 in October 2019, $7,631.43 in November 2019, $1,396.86 in December 2019, $4,337.66 in January 2020, $2,834.95 in February 2020, $401.59 in March 2020, $158.20 in April 2020, and $9,133.28 in May 2020. *See* Ex. P-11.

At Trial, the Debtor testified that he did not intend to "run away from any debts" when he stopped payment to Kapitus. Oct. 26th Tr. 89:10-22. Rather, his intent was to roll his debts together through a debt consolidation. Oct. 26th Tr. 110:2-9.

Also at Trial, the authenticity of Exhibit P-1, the Finance Application, was the subject of significant dispute. *See* Oct. 26th Tr. pg. 11–23. Plaintiff's counsel asserted that Debtor's counsel had stipulated prior to Trial to the admissibility of the Finance Application, as evidenced by the Joint Pretrial Statement. Oct. 26th Tr. 11:22-25; 18:1-8. Based primarily on Plaintiff's counsel's assertions at Trial, the Court did not allow the Debtor to present evidence or arguments disputing the authenticity of the Finance Application or the accuracy of the statements made therein. *See, e.g.*, Oct. 26th Tr. 51:13-15. Upon further review, the Court determined that the Joint Pretrial Statement does not support the assertion that the Debtor stipulated to the admissibility of the Finance Application. *See* Case No. 21-00029, ECF 19. To the contrary, the Joint Pretrial Statement clearly states that the "Defendant disputes the [Finance] Application attached to the Complaint correctly contains the information he supplied." *Id.* at 3.

On November 9, 2023, the Court entered an order directing the parties to submit supplemental post-trial briefing regarding the admissibility of the Finance Application. Case No. 21-00029, ECF 63. The Debtor was directed to submit supplemental briefing explaining his legal arguments regarding the accuracy and authenticity of the Finance Application, and Kapitus was directed to submit supplemental briefing explaining why Plaintiff's counsel took the position that the parties had stipulated to the admissibility of the Finance Application prior to Trial. *Id.*

On December 11, 2023, both parties submitted their supplemental briefs. Case No. 21-00029, ECF 65, 66. Upon consideration of the post-trial briefing, the Court decided to reopen the record to allow the Debtor to present evidence regarding the authenticity of the Finance

Application.  This decision was communicated to the parties at a status hearing held on January 31, 2024.

On April 29, 2024, an evidentiary hearing ("April 29th Hearing") was held over Zoom. Case No. 21-00029, ECF 75.  At the April 29th Hearing, the Debtor testified that he did not complete the Finance Application or otherwise provide the information contained in the Finance Application. Apr. 29th Tr. 10:18-24.  No witness at Trial or the April 29th Hearing authenticated the Finance Application or was able to confirm who prepared it.  At the April 29th Hearing, David Wolfson ("Mr. Wolfson"), Vice President of Risk Management and Asset Recovery at Kapitus, admitted that he did not know whether the Finance Application was completed by the Debtor or by a representative of Home Run Capital. Apr. 29th Tr. 59:7-11.  The Debtor also presented evidence that the Finance Application contains several notable inaccuracies, including the Debtor's phone number, home address, and the name of the Debtor's landlord. Apr. 29th Tr. 14:8-11, 23:14-16, 24:2-5.  Based on the evidence presented at the April 29th Hearing, the Court finds that the Debtor did not complete the Finance Application or otherwise provide the information contained therein.  Therefore, the Court will not attribute the statements made in the Finance Application to the Debtor.

On May 6, 2024, the Debtor filed a *Summation/Proposed Findings of Fact*. Case No. 21-00029, ECF 72.  The matter was taken under advisement and is now ripe for decision.

## IV.   DISCUSSION

Kapitus argues that the Debt is nondischargeable pursuant to § 523(a)(2)(A), §523(a)(2)(B), § 523(a)(4), and/or § 523(a)(6) of the Bankruptcy Code.  In Count I, Kapitus avers that the Debtor obtained the Purchase Price by false pretenses, false representations, or actual fraud, and therefore the Debt is nondischargeable pursuant to § 523(a)(2)(A). Compl. ¶¶

44–58.  Kapitus avers that the Debtor made several material misrepresentations and omissions in the Finance Application, the Factoring Agreement, and during the Funding Call. *Id.* at ¶¶ 48–50. Kapitus further avers that the Debtor knew that such statements were false, untrue, and misleading and knew that such statements would induce Kapitus to tender the Purchase Price to High Performance. *Id.* at ¶ 52.

In Count II, Kapitus avers that the Debt is also nondischargeable pursuant to § 523(a)(2)(B) because the Debtor made several materially false statements in writing respecting High Performance's financial condition. *Id.* at ¶¶ 59–73.  Kapitus avers that it reasonably relied on such representations when deciding to enter into the Factoring Agreement, and Kapitus suffered damages as a direct and proximate consequence of the materially false representations. *Id.* at ¶¶ 68, 69.  Kapitus further avers that the Debtor made such statements with the intent to deceive. *Id.* at ¶ 71.

In Count III, Kapitus argues that the Debt is nondischargeable pursuant to § 523(a)(4) because the Debtor obtained the cash advance and took the Receivables, which belong to Home Run Capital, by committing fraud and defalcation while acting in a fiduciary capacity as the owner, managing member, shareholder, officer, and/or director of High Performance. *Id.* at ¶¶ 74–83.  Kapitus asserts that the Debtor misappropriated portions of the Purchase Price and Receivables for his own personal benefit by fraudulent intent or deceit. *Id.* at ¶¶ 76–78. Alternatively, Kapitus asserts that the Debtor's misappropriation of the Purchase Price and Receivables constitutes embezzlement. *Id.* at ¶ 79.

Finally, in Count IV, Kapitus argues that the Debt is nondischargeable pursuant to § 523(a)(6) because the Debtor's actions constitute willful and malicious conduct which injured Kapitus, averring that Debtor entered into the Factoring Agreement with the specific intent to

11

induce Kapitus to extend the Purchase Price without any intention to comply with the terms of the Factoring Agreement. *Id.* at ¶¶ 84–93.

For the reasons discussed below, the Court concludes that the Debtor willfully and maliciously converted the Receivables, which belonged to Home Run Capital pursuant to the Factoring Agreement.  As such, the Court concludes that the Debt owed to Kapitus in the amount of $174,950.81 is nondischargeable under § 523(a)(6).  Because the Court finds that the Debt is nondischargeable pursuant to § 523(a)(6), the Court need not further address the Plaintiff's claims in Count I, Count II, and Count III.

### A. 11 U.S.C. § 523(a)(6)

Pursuant to § 523(a)(6), a debt arising from "willful and malicious injury by the debtor to another entity or to the property of another entity" will not be discharged.  To succeed on a § 523(a)(6) claim, the Plaintiff must prove by a preponderance of the evidence that the injury to the Plaintiff was both willful and malicious. *Beard Research, Inc. v. Kates (In re Kates),* 485 B.R. 86, 100 (Bankr. E.D. Pa. 2012).  "Willful" means a "deliberate or intentional injury, not just a deliberate or intentional act that leads to an injury." *Id.*  "Actions taken for the specific purpose of causing an injury as well as actions that have a substantial certainty of producing injury are 'willful' within the meaning of § 523(a)(6)." *Id.* "'Malice' refers to actions that are wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." *Id.* at 101. A debtor may act with malice without bearing any subjective ill will toward the creditor or any specific intent to injure the same. *Id.*

Conversion can constitute a willful and malicious injury to property for the purpose of §523(a)(6). *Itria Ventures LLC v. O'Keefe (In re O'Keefe)*, 2020 Bankr. LEXIS 2420, at *17–18 (Bankr. N.D.N.Y. Sept. 11, 2020); *CM P'ship v. Groover (In re Groover)*, 2004 WL 212948, at *7 (Bankr. M.D.N.C. Jan. 16, 2004).  "Under Pennsylvania law, the elements of conversion are:

(1) the deprivation of another's right of property, or use or possession of a chattel, or other

interference therewith; (2) without the owner's consent; and (3) without legal justification."

*Hartford Fire Ins. Co. v. Lewis (In re Lewis),* 478 B.R. 645, 668 (Bankr. E.D. Pa. 2012) (*quoting*

*Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir.

1995)).  Courts have held that by diverting funds on existing contracts away from the purchasing

company, debtors willfully and maliciously injure the creditor by denying the creditor funds to

which it was entitled. *In re O'Keefe*, 2020 Bankr. LEXIS 2420, at *22.  Courts have also found

willful and malicious injury where a debtor intended to improperly dispose of collateral and use

the proceeds for purposes other than payment of the secured debt. *Id.* at *18.

> Under circumstances very similar to the allegations here, the *Groover* court explained:

> > [h]ere, the Complaint includes allegations sufficient to infer that the Defendants
> > converted property of another. The Complaint alleges that Defendants secretly
> > deposited into Forsyth Drywall's account at least two checks from contractors
> > remitting payment on factored invoices. CM Partnership had purchased those
> > receivables and was entitled to those payments pursuant to the terms of the
> > Factoring Agreement…Viewing the allegations in the light most favorable to the
> > Plaintiffs, the Complaint alleges sufficient factual details from which the court
> > can infer that the Defendants acted willfully and maliciously to cause
> > injury…under § 523(a)(6).

*In re Groover*, 2004 WL 212948, at *8.

> Here, the evidence presented at Trial is sufficient to find that the Debtor converted

property of another.  Pursuant to the Factoring Agreement, Home Run Capital became the owner

of the Receivables. *See* Ex. P-3, 1.  The Debtor admitted at Trial that he directed Citizens Bank

to stop payment to Kapitus, despite selling the Receivables to Home Run Capital and granting

Home Run Capital irrevocable access to the Receivables. Oct. 26th Tr. 110:2-4.  This action

constitutes a malicious injury without just cause or excuse, as Debtor had sold the Receivables to

Home Run Capital and had verified for Home Run Capital that High Performance's financial

condition was sound in the Factoring Agreement.  The Court further finds that converting the

Receivables constituted a willful injury and does not find Debtor's testimony that he intended to honor his obligations under the Factoring Agreement credible.  Only *a few weeks* after High Performance received the cash advance and after only making *nineteen* total daily payments, the Debtor directed Citizens Bank to stop payment to Kapitus despite granting Kapitus irrevocable access to those Receivables less than three weeks prior.  That the Debtor began moving large sums of money from his Business Account to his personal account mere *days* after receiving the cash advance only further supports the Court's finding that Debtor never intended to give Kapitus meaningful access to the Receivables. *See* Ex. P-5.  That High Performance did not remit any payments pursuant to the Factoring Agreement after cutting off access to the Business Account, even when it had profitable months, bolsters the Court's determination in this regard. The Court infers that the Debtor wanted the cash advance with no strings attached and willfully deceived Kapitus to make this happen, rendering his conversion of the Receivables for his personal benefit a willful injury.  As such, the Court finds the Debt nondischargeable pursuant to § 523(a)(6).

## V.    CONCLUSION

For all the reasons stated, the Court holds that the Debt owed to Kapitus in the amount of $174,950.81 is nondischargeable under 11 U.S.C. § 523(a)(6).

.

Date: Sept. 3, 2024

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge